## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, *in his official capacity as Acting Secretary of Homeland Security*; and MATTHEW ALBENCE, *in his official capacity as Acting Director of United States Immigration and Customs Enforcement,*<br><br>                    Defendants. | CIVIL ACTION NO.<br><br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## INTRODUCTION

1.     This lawsuit challenges the federal government's policy that unlawfully prevents international students from maintaining F-1 and M-1 student visas if they are enrolled in an online-only course of study for the fall 2020 semester.

2.     Following the World Health Organization ("WHO")'s designation of the coronavirus disease 2019 ("COVID-19") outbreak as a Public Health Emergency of International Concern on January 30, 2020,[1] our nation has gone to extraordinary lengths to combat the COVID-19 epidemic and promote public health.

---

[1] Ctr. for Disease Control & Prevention, *New ICD-10-CM code for the 2019 Novel Coronavirus (COVID-19)* (Apr. 1, 2020), https://www.cdc.gov/nchs/data/icd/Announcement-New-ICD-code-for-coronavirus-3-18-2020.pdf

3.      Days before the WHO declared COVID-19 a global pandemic,[2] on March 7, 2020, the New York Governor Andrew Cuomo declared a state of emergency to address the threat that COVID-19 posed to the health and welfare of New York's residents and visitors. State of N.Y. Exec. Order 202, *Declaring a Disaster Emergency in the State of New York* (Mar. 7, 2020).  And on March 13, 2020, the President declared a national emergency to contain and combat the virus in the United States.  Proclamation 9994 of Mar. 13, 2020, *Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, 85 Fed. Reg. 15,337 (Mar. 18, 2020).

4.      Because the coronavirus is an airborne disease that is most easily transmitted through close face-to-face contact, minimizing in-person gatherings and maximizing social distancing have proven to be integral components of coronavirus mitigation.

5.      To that end, New York's postsecondary institutions have devoted significant resources towards continuing the education of millions of students while safeguarding the public health, including by closing nearly every college and university as of late March 2020, shifting to remote teaching and learning, implementing measures to keep school campuses safe, and diverting limited financial resources to the COVID-19 response.

6.      In recognition of the near universal transition to remote learning in New York and across the country, on March 13, 2020, the United States Immigration and Customs Enforcement ("ICE"), a sub-agency of the Department of Homeland Security, issued a waiver to agency regulations that required noncitizens on F-1 and M-1 student visas to attend a majority of their

---

[2] Id.

classes in person.  ICE's directive was issued due to "the extraordinary nature of the COVID-19 emergency," and was to remain in "effect for the duration of the emergency."[3]

7.      Arbitrarily and without notice, ICE issued a Broadcast Message on COVID-19[4] and fall 2020 ("the Directive") on July 6, 2020 announcing that it would rescind its March 13, 2020 waiver, thereby requiring all international students on F-1 and M-1 visas to either enroll in in-person classes for the fall 2020 semester or immediately depart the country.  Students on F-1 and M-1 visas currently outside of the United States are now barred from reentering if their schools offer online-only instruction for the fall.  ICE's new Directive also requires schools offering online-only instructions to submit an "operational change plan" no later than Wednesday, July 15, 2020.  Universities that offer a hybrid of online and in-person courses must certify for each international student that their "program is not entirely online, that the student is not taking an entirely online course load for the fall 2020 semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program," and issue new Form I-20s for all of these students by August 4, 2020.

8.      ICE's rescission comes amid record-setting COVID-19 infection rates.  As of July 13, 2020, over 3 million Americans have tested positive for coronavirus, and over 132,000 died of COVID-19 and related illnesses.[5]  In New York, over 406,000 people have tested positive for coronavirus, and over 32,000 have died.  These statistics – and the resulting devastation – are

---

[3] U.S. Immigration & Customs Enforcement, *COVID-19: Guidance for SEVP Stakeholders* (Mar. 13, 2020),
https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_3.13.20.pdf
[4] U.S. Immigration & Customs Enforcement, *Broadcast Message: Coronavirus Disease 2019 (COVID-19) and Potential Procedural Adaptations for F and M nonimmigrant students* (Mar. 9, 2020),
https://www.ice.gov/doclib/sevis/pdf/bcm2003-01.pdf
[5] Christopher Weber and Sophia Tulp, *Confirmed Coronavirus Cases in the U.S. hit 3 Million and Climbing*, ABC News (Jul. 8, 2020), https://abcnews.go.com/Health/wireStory/australia-isolates-virus-prone-state-serbs-oppose-lockdown-71664928

exponentially higher as compared to when ICE initially issued its "emergency" student visa waiver in mid-March.

9.      ICE's Directive is in line with the federal administration's stated goal of quickly re-opening schools, callously ignoring prevailing public health guidelines calling for sustained social distancing and tailored reopening plans of only the most essential activities.

10.     ICE's rash and ill-informed decision to promote school re-openings not only endangers the public health, but also threatens the immigration status of the over 100,000 international students who study in New York each year, many of whom may not be able to secure enrollment in compliant educational programs by the Directive's August 4 deadline.

11.     ICE's Directive will cause immediate, irreparable, and ongoing harm to New York, its educational institutions, and its residents.  The Directive's true mandate – to increase in-person instruction – runs counter to public health guidelines and expertise, and would demand that schools either reconfigure their fall 2020 course offerings in a matter of days, or risk international students dis-enrollment.  Implementing ICE's Directive will drain and divert New York's limited educational resources, hinder the State's effective administration and enforcement of its own COVID-19 policies, result in millions in lost tuition and revenue, and jeopardize the health and safety of all New Yorkers.

12.     Defendants' drastic and unreasonable departure from its prior COVID-19 student visa policy violates the Administrative Procedure Act ("APA") in several respects.  *First,* the Directive is arbitrary and capricious because it failed to consider the resulting harms to education and public health, as well as the fact that the emergency which necessitated ICE's March 13, 2020 waiver – the coronavirus pandemic – continues unabated to this day.  *Second*, ICE failed to engage in notice and comment rulemaking, or provide any modicum of notice, before enacting

these abrupt changes to its prior policy, upon which New York's educational institutions, and their international students, relied.

13.     Plaintiff the State of New York brings this action to enjoin Defendants from enforcing ICE's July 6, 2020 Directive or promulgating it as a Temporary Final Rule because (a) the Directive is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A); and (b) Defendants failed to observe procedures required by law in issuing the Directive in violation of the APA, 5 U.S.C. § 706(2)(D).

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

15.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1).  Defendants are United States agencies or officers sued in their official capacities. The State of New York is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the Southern District of New York.

16.     Declaratory and injunctive relief is sought consistent with 5 U.S.C. §§ 705 and 706, and as authorized in 28 U.S.C. §§ 2201 and 2202.

## PARTIES

17.     The Plaintiff the State of New York, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action under N.Y. Executive Law § 63.

18.     Plaintiff is aggrieved by Defendants' actions and has standing to bring this action because Defendants' Directive harms or will harm its sovereign, quasi-sovereign, economic, and

proprietary interests and will continue to cause injury unless and until the Directive is vacated and enjoined.

19.     Defendant the U.S. Department of Homeland Security is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f).  Its mandate includes the administration of the interior enforcement provisions of the country's immigration laws.

20.     Defendant Chad F. Wolf is the Acting Secretary of Homeland Security.  He is sued in his official capacity.

21.     Defendant U.S. Immigration and Customs Enforcement is a sub-agency of DHS. ICE is responsible for the administration of the interior enforcement provisions of the country's immigration laws.  ICE issued the Directive, and ICE is responsible for enforcing federal immigration law, including identifying, apprehending, detaining, and removing non-citizens.

22.     Defendant Matthew T. Albence is the Acting Director of U.S. Immigration and Customs Enforcement.  He is sued in his official capacity.

## ALLEGATIONS

### I.     The COVID-19 Pandemic.

23.     On January 30, 2020, the World Health Organization designated the coronavirus disease 2019 ("COVID-19") outbreak as a Public Health Emergency of International Concern. On March 11, the WHO declared COVID-19 a global pandemic.[6]

24.     On March 7, 2020, the New York Governor Andrew Cuomo declared a state of emergency to address the threat that COVID-19 poses to the health and welfare of New York's

---

[6] World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020

residents and visitors.  State of N.Y. Exec. Order 202, Declaring a Disaster Emergency in the

State of New York (Mar. 7, 2020).  And on March 13, 2020, the President declared a national

emergency to contain and combat the virus in the United States.  Proclamation 9994 of Mar. 13,

2020, Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)

Outbreak, 85 Fed. Reg. 15,337 (Mar. 18, 2020).

25.     For many, the virus can cause severe and life-threatening respiratory illness

marked by fever, coughing, and difficulty breathing.  *See* Centers for Disease Control &

Prevention, *Coronavirus Disease 2019 (COVID-19) Frequently Asked Questions* (internet) (last

updated Jul. 3, 2020).[7]  The disease is spreading extensively in communities throughout the

country, with cases reported in all fifty states.  *See* Centers for Disease Control & Prevention,

*Coronavirus Disease 2019 (COVID-19) Situation Summary* (internet) (last updated Jul. 11,

2020).[8]

26.     Public health experts have determined that COVID-19 is a respiratory disease,

and is most easily transmittable through close-contact inhalation.  As such, public health experts

have strongly advised against indoor gatherings of any size.

27.     The Centers for Disease Control ("CDC") has identified factors that contribute to

COVID-19 acceleration and issued corresponding guidance.[9]  Among other factors, "large

gatherings" and "crowding and high population density" are identified as COVID-19

transmission accelerants.  The CDC recommends "restricting mass gatherings; global travel

---

[7] Ctr. for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19) Frequently Asked Questions* (Updated Jul. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/faq.html
[8] Ctr. for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19), Cases in the U.S.* (Updated Jul. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html
[9] Ctr. for Disease Control & Prevention, *Public Health Response to the Initiation and Spread of Pandemic COVID-19 in the United States, February 24–April 21, 2020* (May 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6918e2.htm

restrictions and domestic travel recommendations, recommending transition to *virtual events*."[10] (emphasis added)  For "crowding and high population density," the CDC recommends "stay-at-home orders, recommendations for hand washing and social distancing, cloth face covering guidance, school dismissals, extended telework, environmental surface cleaning."[11]

28.     New York State, like many states, has enacted broad closures of businesses and government offices, and mandated the cancellation of public events across all industries to reduce face-to-face interactions and the resulting risk of coronavirus transmission.[12]  New York State is particularly concerned with minimizing the need for indoor in-person events.[13]

29.     Schools are no exception.  As most college and university classroom settings necessitate that students and instructors gather for extended periods of time indoors, and where social distancing is not always feasible, remote learning is the most practicable way to minimize the spread of coronavirus while providing continuous instruction.

30.     As such, the majority of campuses in New York State have been closed since March 2020, are engaged in remote teaching and learning, and are in the midst of developing reopening plans for the fall 2020 semester.[14]

---

[10] *Id.*

[11] *Id.*

[12] Jasmine C. Lee, Sarah Mervosh, Yuriria Avila, Barbara Harvey, and Alex Leeds Matthews, *See How All 50 State Are Reopening*, N.Y. Times (and Closing Again) (Updated Jul. 11, 2020), https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html

[13] Chas Danner, Matt Stied, and Adam K. Raymond, *Everything We Do and Don't Know About New York's Reopening*, N.Y. Magazine (Updated Jul. 9, 2020), https://nymag.com/intelligencer/2020/07/when-will-new-york-reopen-phases-and-full-plan-explained.html

[14] Abigail Hess, *How coronavirus dramatically changed college for over 14 million students*, CNBC (Mar. 26, 2020), https://www.cnbc.com/2020/03/26/how-coronavirus-changedcollege-for-over-14-million-students.html; Erica Schwiegershausen, *When Will Schools Reopen?*, The Cut (Jul. 9, 2020), https://www.thecut.com/2020/07/will-schools-open-in-the-fall-reopening-statuses-explained.html

31.     While these measures are in effect, the United States has set new records for daily coronavirus infections.  As of July 13, 2020, over 3 million Americans have tested positive for the coronavirus, and over 132,00 have died due to COVID-19 and related illnesses.[15]  Recent weeks have demonstrated that even modest loosening of coronavirus restrictions and social distancing measures can have devastating consequences.[16]

**A. ICE's Initial Response to the COVID-19 Pandemic.**

32.     Under the Immigration and Nationality Act ("INA"), a person applying for an F-1 visa must have "a residence in a foreign country which he has no intention of abandoning, [and be] a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purposes of pursuing such a course of study…at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution."  8 U.S.C. § 1101(a)(15)(f).

33.     A person seeking an M-1 vocational nonimmigrant visa must also have "a residence in a foreign country which he has no intention of abandoning [and] seeks to enter the United States temporarily and solely for the purpose of pursing such a course of study" at an "established, approved educational institution."  8 U.S.C. § 1101(a)(15)(m).

34.     Under the regulations implementing the INA's F-1 and M-1 visa eligibility requirements, a "full course of study" is twelve credit hours per academic term.  Prior to ICE's March COVID-19 waiver, students on F-1 visas were allowed to enroll in online or remote learning for "no more than the equivalent of one class or three credits per session, term,

---

[15] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (last visited July 7, 2020) https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html [https://perma.cc/25D3-UPBH.]
[16] *U.S. Hits Another Record for New Coronavirus Cases*, N.Y. Times, (Jul. 10, 2020), https://www.nytimes.com/2020/07/09/world/coronavirus-updates.html

semester, trimester, or quarter. . .." 8 C.F.R § 214.2(f)(6).  Students were not permitted to use

any online or distance education course credits towards their M-1 visa status.  8 C.F.R.

§ 214.2(m)(9)(v).

  35. The Student Exchange and Visitor Program ("SEVP") administers ICE's F-1 and

M-1 regulations.[17]  Under this program, schools must have a "designated school official"

("DSO") or a "principal designated school official" ("PDSO") who is the point of contact for any

issue relating to the institution's compliance with SEVP regulations.  Periodically, schools must

also report certain information to SEVP through the Student and Exchange Visitor Information

System (SEVIS).  Schools must provide confirmation that a student initially arrived in the United

States, confirmation that the student is active each semester, transfer information, changes in

students' status, and general information regarding students' employment, academic programs,

and dependents.[18]  Once an international student is accepted into SEVP, a school issues a Form

I-20, Certificate of Eligibility for Nonimmigrant Student Status.  *Id.*

  36. On March 9, 2020, SEVP issued a Broadcast Message ("March 9 Broadcast")

advising SEVP-certified schools that they "may need to adapt their procedures and policies to

address the significant public health concerns associated with the COVID-19 crisis" (appended

as Ex. 1).  The March 9 Broadcast included SEVP reporting instructions crafted to address

"COVID-19 procedural adaptations to SEVP."  Through this March 9 Broadcast, SEVP

conveyed its intent on "ensuring that nonimmigrant students are able to continue to make normal

progress in full course of study as required by federal regulations."  SEVP also intended "to be

---

[17] U.S. Dep't of Homeland Sec., *STUDY in the STATES, SEVIS HELP HUB* (last visited Jul. 12, 2020), https://studyinthestates.dhs.gov/sevis-help-hub/school-records/school-certification/form-i-17-initial-certification
[18] U.S. Immigration & Customs Enforcement, *SEVIS Reporting Requirements for Designated School Officials* (last visited Jul. 12, 2020), https://www.ice.gov/sevis/dso-requirements

flexible with temporary adaptations" and understood that institutions may need "to comply with state or local health emergency declarations."

37.     On March 13, 2020, SEVP, consistent with the intentions conveyed in its March 9 Broadcast and in recognition of the extraordinary threats that the COVID-19 pandemic presented to in-person learning, issued guidance (the "March 13 Guidance") exempting students from the regulatory in-person learning requirements for the duration of the pandemic (appended as Ex. 2). Specifically, the March 13 Guidance was issued in response to "inquiries concerning the proper status" of international students in the United States on academic visas "who may have [to] face slightly different scenarios related to emergency procedures implemented by SEVP-certified learning institutions."

38.     The March 13 Guidance addresses the status of students whose "school temporarily stops in-person classes but implements online or other alternate learning procedures and the nonimmigrant student remains in the United States." *Id*.  Per this guidance, ICE encouraged students in this situation to continue their studies by permitting them to "participate in online or other alternative learning procedures and remain in active status in SEVIS." *Id.*  To effectuate a continuity of learning, ICE declared that due to the "extraordinary nature of the COVID-10 emergency, SEVP will allow F-1 and/or M-1 students to temporarily count online classes towards a full course of study in excess of the limits of 8 C.F.R. § 214.2(f)(6) and 8 C.F.R. § 214.2(m)(9)(v)." *See id.*

39.     Through the March 13 Guidance, ICE enabled students to continue their education while providing educational institutions the flexibility needed to comply with state and local health emergency declarations.  To date, the United States remains in a state of public health emergency as daily COVID-19 cases continue to spike.  Without a viable COVID-19

treatment or vaccine, Plaintiff and educational institutions must resort to prophylactic measures, such as avoidance of indoor gatherings, to reduce the rate of COVID-19 transmission.

**B. New York's Response to the Coronavirus**

40.     Following the Governor of New York's emergency declaration in March 2020, New York State has been in the throes of an unprecedented public health crisis.

41.     New York is one of the epicenters of the pandemic and has suffered catastrophic losses due to COVID-19.  As of July 13, 2020, over 401,700 people in the State have tested positive for COVID-19 and over 24,979 New Yorkers have died from it.[19]  In New York City alone, 215,924 residents have been diagnosed with COVID-19, 55,451 have required hospitalization to treat it, and at least 18,670 have died from it.[20]

42.     In response to this extraordinary public health emergency, Governor Cuomo ordered all schools in New York to close temporarily on March 18, 2020.  N.Y. Exec. Order No. 202.4.  This executive order was extended several times and remains in effect to date.

43.     As a result, most public and private K-12 schools, colleges, universities, and other educational institutions in the State are closed, with millions of students being forced to learn remotely.

44.     Consistent with CDC guidance and Governor Cuomo's COVID-19 directives, all campuses of the State University of New York ("SUNY") are closed to in-person instruction in March 2020.  SUNY faculty and staff worked hard to quickly move courses online.

---

[19] N.Y. Dep't of Health, *COVID-19 Tracker* (last accessed July 13, 2020), https://covid19tracker.health.ny.gov
[20] N.Y.C. Dep't of Health & Mental Hygiene, *COVID-19: Data* (last accessed July 13, 2020), https://www1.nyc.gov/site/doh/covid/covid-19-data.page

45.     On May 19, 2020, the CDC offered "considerations for the ways in which schools can protect students, teachers, administrators, and staff and slow the spread of COVID-19."[21] Per the CDC's guidance "[s]chools can determine, in collaboration with state and local health officials to the extent possible, whether and how to implement these considerations while adjusting to meet the unique needs and circumstances of the local community."  Defendants' own public health experts declared that "[i]mplementation should be guided by what is *feasible*, *practical*, *acceptable*, and *tailored to the needs of each community*." (emphasis added).

46.     The CDC school guidance states, "the more people a student or staff member interacts with, and the longer that interaction, the higher the risk of COVID-19 spread."  The CDC identified factors that increase the risk of COVID-19 spreading.  Those factors are listed from lowest risk to highest risk:

a.  "Lowest Risk: students and teachers engage in virtual-only classes, activities, and events.

b.  More Risk: Small, in-person classes, activities, and events. Groups of students stay together and with the same teacher throughout/across school days and groups do not mix.  Students remain at least 6 feet apart and do not share objects (e.g., hybrid virtual and in-person class structures, or staggered/rotated scheduling to accommodate smaller class sizes).

c.  Highest Risk: Full sized, in-person classes, activities, and events. Students are not spaced apart, share classroom materials or supplies, and mix between classes and activities."[22]

---

[21] Ctr. for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19) Consideration for Schools* (last visited Jul. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/schools.html
[22] *Id.*

47.     Among other health and safety recommendations, the CDC advises schools to "increase circulation of outdoor air as much as possible," "space seating/desks at least 6 feet apart when feasible," "install physical barriers, such as sneeze guards and partitions, particularly in areas where it is difficult for individuals to remain at least 6 feet apart," "[c]lose communal use shared spaces such as dining halls," offer virtual learning, "train staff on all safety protocols," and "conduct daily health checks."[23]

48.     Prior to the issuance of the Directive, SUNY committed many hours and resources to developing a reopening plan for the fall 2020 semester (the "Reopening Plan"). Each of SUNY's 64 campuses developed reopening plans that were responsive to the specific needs of each campus.

49.     SUNY also relied on ICE's March 2020 waiver regarding the SEVP program in developing plans for the fall 2020 semester.

50.     The Reopening Plan was developed in response to state directives requiring higher education institutions to develop and submit plans for reopening during the COIVD-19 pandemic. These directives required that reopening plans address specified COVID-related considerations, including: measures to ensure appropriate social distancing; plans for the procurement and distribution of personal protective equipment; and mechanisms for monitoring and tracking health conditions on campus.[24]

---

[23] Id.
[24] N.Y. Dep't of Health, In*terim guidance for Higher Education During the COVID-19 Public Health Emergency* (last visited Jul. 12, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/Higher_Education_Detailed_Guideli nes.pdf; N.Y. Governor, *Reopening New York: Higher Education Guidelines* (Jun. 22, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/Higher_Education_Summary_Guide lines.pdf; N.Y. Governor, *Reopening New York: Checklist for Higher Education Reopening Plans* (Jun. 18, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/Higher_Education_Reopening_Plan

51.     Consistent with the CDC's guidelines, New York State's guidelines emphasized that reopening plans should ensure, for example, that a distance of at least six feet is maintained between students in classrooms.[25]

52.     SUNY's Reopening Plan complied with state guidelines while allowing SUNY's campuses to offer some online and some in-person or hybrid in-person/online courses.

53.     As the pandemic progresses, New York and its public colleges and universities continue to take a science-based approach centered on public health.  While New York has permitted some counties that meet public health thresholds to reopen, many public spaces and parts of the economy, remain under strict guidelines.  All schools remain closed at present. Moreover, New York's COVID-19 directives remain in place and when residents are out in public they must maintain social distancing.

## II.     ICE Reverses its Prior COVID-19 Priorities, and issues its Directive on COVID-19 and Fall 2020 SEVP Participants.

54.     On July 6, 2020, ICE, without notice and comment or any discernible consideration of outside evidence whatsoever, issued its Directive abruptly rescinding its March 13 Guidance upon which Plaintiff's public colleges and universities relied (appended as Ex. 3). Along with the Directive, ICE issued a press release describing "modifications…to temporary exemptions for nonimmigrant students taking online classes due to the pandemic for the fall 2020 semester."[26]

_____

_Checklist.pdf
[25] N.Y. Governor, *Reopening New York: Higher Education Guidelines*  (Jun. 22, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/Higher_Education_Summary_Guidelines.pdf; Ctr. for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19), Considerations for Schools* (Updated May 19, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/schools.html
[26] U.S. Immigration & Customs Enforcement, *SEVP modifies temporary exemptions for nonimmigrant students taking online courses during fall 2020 semester* (Jul. 6, 2020),

55.     The Directive provides no safe harbor for schools operating under hybrid in-person and virtual learning. "Students attending schools offering a hybrid model—that is, a mixture of online and in person classes—will be allowed to take more than one class or three credit hours online," provided that for each student, the school "certif[ies] to SEVP, through the Form 1-20, 'Certificate of Eligibility for Nonimmigrant Student Status,' that the program is not entirely online, that the student is not taking an entirely online course load this semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program." Ex. 3.  To comply with this requirement, schools will need to issue a new Form I-20 for thousands of students on F-1 and M-1 visas and do so within 21 business days of the July 6 Directive.  This unduly burdensome requirement disregards that students generally are not required to register for classes until closer to the start of the semester.

56.     The Directive and accompanying news release demonstrate Defendants' disregard for the well-being of students, faculty, staff, and surrounding communities by requiring students to attend classes as a condition of maintaining their student visas.

57.     The timing of ICE's abrupt July 6 Directive also suggests that Defendants are motivated by political calculations rather than sound education and public health policy.  The Directive is one of various recent efforts by the current administration to compel states to adhere to the federal government's reckless push to re-open schools amid a surging pandemic.[27]

---

https://www.ice.gov/news/releases/sevp-modifies-temporary-exemptions-nonimmigrant-students-taking-online-courses-during

[27] Christina Wilkie, *Trump Threatens to Cut Funding for Schools, Slams CDC Reporting Guidelines as Too Tough and Expensive*, CNBC (Jul. 8, 2020), https://www.cnbc.com/2020/07/08/coronavirus-trump-threatens-to-cut-school-funding-slams-cdc-reopening-guidelines.html; *see also*, Collin Binkely, *"We're Very Much Going to Push Pressure on Governors and Everybody Else." Trump Pushes to Reopen Schools This Fall*, Time (Jul. 7, 2020), https://time.com/5864008/donald-trump-schools-reopening-covid-19/; Elena Rabinowitz, *I Teach Public School. I Love My Students. I Don't Want to Die*, CNN (Jul. 10, 2020), https://www.cnn.com/2020/07/10/opinions/schools-reopening-covid-19-pandemic-

58.     Kenneth Cuccinelli, Senior Official Performing the Duties of the Director, United States Citizenship and Immigration Services, recently stated that the July 6 Directive was part of the federal administration's efforts to reopen all schools.[28]  The July 6 Directive constitutes a convergence of the administration's cruel immigration agenda and its efforts to coerce states into reopening schools amid a pandemic.

59.     The Directive's coercive elements comes in various forms including a heightened-risk of deportation on students with visas.  The Directive states, "Nonimmigrant F-1…students attending schools operating entirely online may not take a full online course load and remain in the United States.  The U.S. Department of State will not issue visas to students enrolled in schools and/or programs that are fully online for the fall semester nor will U.S. Customs and Border Protection permit these students to enter the United States."

60.     Moreover, the Directive orders that "[a]ctive students in the United States enrolled in such programs must depart the country or take other measures, such as transferring to a school with in-person instructions to remain in lawful status.  If not, they may face immigration consequences including, but not limited to, the initiation of removal proceedings."

61.     According to the Directive, the "U.S. Department of Homeland Security plans to publish the procedures and responsibilities…in the near future as a Temporary Final Rule in the Federal Register."  As of the filing of this Complaint, Defendants have not published any procedures or responsibilities in the Federal Register.

62.     Defendants' Directive undermines public health by requiring schools to provide in-person instruction and risk the health and safety of students, faculty, and surrounding communities

---

rabinowitz/index.html
[28] John Bowden, *Cuccinelli Says Rule Forcing International Students to Return Home Will "Encourage Schools to Reopen"*, The Hill (Jul. 7, 2020), https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international-students-to-return-home

and by compelling students to attend class in-person or risk deportation.  Defendants, through the Directive, turn a blind eye to their partner agency's own expert evidence regarding COVID-19 safety and transmission risks.[29]  ICE's reasoning that the March 13 Guidance was issued at the "height" of the pandemic, as compared to the status quo on July 6 suggests that ICE believes the pandemic is on the wane.  However, this view is wholly out of step with the national reality,[30] and runs counter to the public health expert warnings of a second COVID-19 wave in the fall of 2020.[31]

### III.     The Directive harms New York.

63.     The Directive harms New York's sovereign, quasi-sovereign, economic, and proprietary interests.

#### A.  The Directive harms New York's economic interests.

64.     There are approximately more than 100,000 degree-seeking international students enrolled in New York State colleges and universities.  International students comprise 10% of all college students in New York State.

65.     The State, through SUNY, directly oversees public colleges and universities, serving more than 700,000 students in two-year, four-year, and graduate programs.  SUNY is the nation's largest comprehensive system of higher education.  SUNY's 64 campuses include research universities, heath science centers, four-year State-operated institutions, two-year Community Colleges, and statutory campuses located at Cornell University and Alfred University.

---

[29] Ctr. for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19), Forecasts of Total Deaths* (Updated Jul. 9, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/forecasting-us.html

[30] Christina Maxouris and Amir Vera, *US is Still "Knee-Deep" in the First Wave of the Coronavirus Pandemic, Fauci Says*, CNN (Jul. 7, 2020), https://www.cnn.com/2020/07/06/health/us-coronavirus-monday/index.html

[31] Len Strazewski, *Harvard Epidemiologist: Beware COVID-19's Second Wave this Fall* (May 8, 2020), https://www.ama-assn.org/delivering-care/public-health/harvard-epidemiologist-beware-covid-19-s-second-wave-fall

Alongside the City University of New York ("CUNY"), SUNY provides a public option to hundreds of thousands of people annually. As of fall 2019, more than 415,000 students were enrolled in a degree program at a SUNY campus. In addition, there are more than 100 private colleges and universities in the State that serve over 500,000 students and are subject to the State's COVID-19 guidelines on social distancing and reopening.

66. SUNY is the largest employer in New York State, employing over 90,000 people. SUNY's Research Foundation ("RF") is the largest comprehensive university-connected research foundation in the country. The RF operates over a $1 billion research program focused on life-changing research across a wide range of disciplines including medicine, engineering, physical sciences, energy, computer science, and social sciences.

67. Nearly 19,000 students on F-1 and M-1 student visas are enrolled or plan to enroll at SUNY for the fall 2020 semester, and approximately 6,100 students on F-1 and M-1 student visas are currently enrolled at CUNY. International students comprise 5% of total SUNY enrollment. At the University of Buffalo ("UB") campus, international students comprise 28% of graduate enrollment.

68. SUNY's international students come from 177 countries and contribute $656 million in tuition and fees, and millions more in housing and other costs each year. The tuition paid by international students alone constitutes about 18% of SUNY's tuition-based revenue (40% for doctoral granting campuses). This means that each international student contributes more than three times as much revenue to support SUNY's operations as the average student. This added revenue undergirds the funding of higher education for hundreds of thousands of New Yorkers.

69. SUNY, CUNY and New York's many colleges and universities stand to lose millions in tuition and other revenue from international students who either withdraw, dis-enroll

or are otherwise unable to continue their education at New York's schools due to the Directive.  In particular, SUNY risks losing revenue from the thousands of students who are currently living outside the United States and may not be able to return due to the Directive's new mandate.  SUNY estimates that anywhere from 20% to 50% of the anticipated international student population will be unlikely to maintain enrollment at SUNY as a result of the Directive.

70.     F-1 and M-1 students who are unable to maintain their coursework for the fall 2020 semester will be denied the opportunity to participate in internship programs and work allowances in the fall and into 2021, as these students are required to complete a full academic year of classes before engaging in work-study programs.  8 C.F.R. § 214.2(f)(10).  Many of these students are developing skills in STEM—Science, Technology, Engineering, and Math – and contribute to cutting edge research.

71.     For example, SUNY employs more than 3,000 international students as research assistants, teaching assistants, and in other capacities.  International students fill close to half of all graduate research positions on externally supported RF research projects, contributing significantly to SUNY's $1 billion dollar research enterprise.  This work includes research related to COVID-19, alternative energy sources, targeted cancer therapies, nanotechnology, 5G technologies, informatics and data analytics, advanced materials, energy storage, early diagnosis of Alzheimer's disease, artificial intelligence, and other critically important topics.

72.     The loss of these researchers, as well as other students assisting in research would be a devastating setback not only to SUNY, but also to the surrounding communities, and the disciplines in which these students work.  At a time when a global pandemic demands investments in healthcare, medicine, science, technology—the keys to unlocking cures and healing ravaged communities—Defendants have callously undermined New York's collective efforts to meet these

20

demands by diverting critical educational resources and disabling the next generation of professional leaders in New York.

**B.  The Directive unreasonably burdens New York's educational institutions.**

73.     Defendants' Directive will have a significant impact on the administration and safety of New York State's colleges and universities in several respects.

74.     Over the last several months, New York's public colleges and universities have expended significant financial resources to develop safe educational protocols and reopening plans.  Since March 2020, higher education administrators have spent countless hours researching, meeting, and planning campus-specific education plans and curricula that account for the health and safety of their students, staff, and faculty.  These decisions on how to proceed with virtual learning during the summer and throughout the fall 2020 were informed by health and safety considerations, state and local public health orders, and in reliance on Defendants' March 13 Guidance.

75.     Due to Defendants' Directive, however, schools must suddenly reverse course and find ways to provide more in-person course offerings to international students.  This sudden change of plans will strain the already limited resources at schools' disposal.

76.     The July 6 Directive creates a logistical and legal morass should schools attempt compliance with the Directive's in-person teaching requirement by August 4, 2020.  State directives require SUNY and other state institutions to operate in-person courses in accordance with public health guidance, including recommendations that schools ensure that a distance of at least six feet is maintained between students in classroom environments.  The limitations of SUNY's physical infrastructure make it virtually impossible for SUNY to increase in-person course options while complying with these public health directives.  Even if SUNY were able to

add more in-person offerings while complying with public health directives, students who are already enrolled in fall 2020 courses would have significant difficulty changing their course enrollments under the unreasonably short timeframe imposed by the Directive.

77.     SUNY will have to devote unbudgeted resources to counseling international students about the need to enroll in an in-person or hybrid course to maintain their visa.  SUNY will also have to devote resources to counseling international students about in-person or hybrid course offerings that are offered and that will enable students to continue to make normal progress in their degree program.

78.     For schools that choose to offer more in-person classes due to the Directive's prohibition on in-country, remote instruction, their students, staff, faculty, and surrounding communities will face increased exposure to the coronavirus.  Schools will also have to allocate funds for increased frequency of classroom cleanings and for purchasing personal protective equipment to distribute to students and faculty.

79.      Further, because students, staff and faculty will likely rely on public transportation and other congregant spaces to get to class, the coronavirus transmission risks will be heightened. Schools in New York City face unique risks in this regard, due to the ridership volume of the New York City subway.

80.     At the same time, schools will have to comply with the new administrative obligations required by the Directive, including the issuance of new Forms I-20 to their entire F-1 and M-1 student body by August 4, 2020.  Last year, SUNY had 18,661 enrolled students who have F-1 or M-1 visas.  Schools like SUNY will be forced to divert financial and administrative resources to quickly re-issue the Form I-20 to tens of thousands of F-1 and M-1 students.  SUNY anticipates that it will have to devote over 9,000 of hours of additional staff time completing

recertification of international students pursuant to the Directive—corresponding to $410,000 in salary-related expenses alone.  The Directive fails to adequately consider the full range of administrative and financial burdens it will impose, nor does it adequately explain why such burdens are warranted on such a short timeframe, and during a public health pandemic.

### C.  The Directive harms New York's ability to provide a safe education to all students.

81.     Many international students who are currently outside the United States face COVID-19 related travel restrictions that prevent them from returning stateside.

82.     Students who are within the United States on F-1 and M-1 visas who cannot comply with the Directive's in-person instruction requirement will have to return to their home country. This travel will also be complicated by current travel restrictions, and/or exorbitant travel costs.

83.     Many students who travel to their home countries will be putting their health at risk by increasing their exposure to COVID-19 in transit.  Some students, such as those from countries disrupted by internal strife, civil war, and political insecurity, may even face the possibility of serious bodily harm or even death due to volatile in-country conditions.

84.     Students who manage to safely return home will likely attend classes in different time zones and will need to secure reliable technology.  Administering instruction across countries with varying degrees of technological and internet access will require significant resources from New York's educational institutions.  Even institutions with the most advanced technology will not be able to close the internet access and technology gaps present in some developing countries, and in the homes of certain students.  Higher educational institutions must also confront additional socio-geopolitical barriers including countries that significantly curtail freedom of speech and access to unbiased information.

85.     Students who cannot meet the in-person course requirements to maintain lawful student status will be subject to removal or barred from entering.  In so doing, the Directive not only needlessly traumatizes international students by increasing their risk to immigration detention and removal but may also force some students to pre-emptively uproot their lives in the United States, breaking leases and other commitments, abandoning their educational pursuits, paying for expensive travel amidst the pandemic, and risking spreading or contracting COVID-19 by traveling to their home countries.  If these students fail to self-deport within a certain period, they risk forced removal which carries the additional penalty of barring their return to the United States for ten years. 8 U.S.C. § 1182(a)(9).

## FIRST CLAIM FOR RELIEF
### (Administrative Procedure Act – Arbitrary and Capricious)

86.     Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

87.     The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

88.     The Directive is arbitrary and capricious because it fails to consider important aspects of the problem, including the resulting harms to Plaintiff's educational institutions and communities, harms to international students planning to study in New York State, New York's public health priorities towards minimizing the transmission of the coronavirus, and the continued existence of the COVID-19 pandemic in the United States.

89.     The Directive is arbitrary and capricious because it fails to adequately justify its departure from ICE's prior COVID-19 response.

90.     The Directive is arbitrary and capricious because Defendants' decision runs counter to the evidence before the agency, relies on factors Congress did not intend the agency to consider, and disregards material facts and evidence.

91.     The Directive is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA.  5 U.S.C. § 706(2)(A).

92.     Defendants' violation causes ongoing harm to Plaintiff and its residents.

## SECOND CLAIM FOR RELIEF
**(Administrative Procedure Act—Without Observance of Procedure Required by Law)**

93.     Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

94.     The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

95.     The APA requires agencies to publish notice of all proposed rulemakings in a manner that "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." 5 U.S.C. § 553(c); *see also id.* § 553(b).

96.     ICE's Directive is a substantive "rule" under the APA. 5 U.S.C. § 551(4).

97.     Consequently, DHS and ICE were required to engage in notice-and-comment rulemaking before implementing the Directive, which they failed to do, in violation of the APA. 5 U.S.C. § 553(d).

98.     New York is harmed by Defendants' failure to engage in notice-and-comment rulemaking because it has not had the opportunity to comment on the rescission of ICE's March 2020 waiver.  Defendants' violations cause ongoing harm to Plaintiff and its residents.

**REQUEST FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court:

1)      Declare that the Directive is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

2)      Declare that Defendants failed to observe procedure required by law in issuing the Directive, in violation of 5 U.S.C. § 706(2)(D);

3)      Enjoin the Department and all its officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Directive;

4)      Postpone the effective date of the Directive pending judicial review pursuant to 5 U.S.C. § 705;

5)      Vacate and set aside the Directive in its entirety;

6)      Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

7)      Grant such other relief as this Court may deem proper.

DATED:  July 13, 2020

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

Steven C. Wu
*Deputy Solicitor General*

Matthew Colangelo
  *Chief Counsel for Federal Initiatives*

Daniela Nogueira
*Assistant Attorney General*

Elena Goldstein
  *Deputy Chief, Civil Rights Bureau*

*Of Counsel*

By: *<u>/s/ Morenike Fajana</u>*
Morenike Fajana, *Special Counsel*
Carolyn Fast, *Special Counsel*
Joel Marrero, *Assistant Attorney General (pro hac vice forthcoming)*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6134
Morenike.Fajana@ag.ny.gov

*Attorneys for the State of New York*