# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, *in his official capacity as Acting Secretary of Homeland Security*; and MATTHEW ALBENCE, *in his official capacity as Acting Director of United States Immigration and Customs Enforcement*,<br><br>　　　　　　Defendants. | 20 Civ. 5349 |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION OR STAY PURSUANT TO 5 U.S.C. § 705

LETITIA JAMES
*Attorney General of the State of New York*

Matthew Colangelo, *Chief Counsel for Federal Initiatives*
Elena Goldstein, *Deputy Chief, Civil Rights Bureau*
Steven C. Wu, *Deputy Solicitor General*
Morenike Fajana, *Special Counsel*
Carolyn Fast, *Special Counsel*
Joel Marrero, *Assistant Attorney General*
Daniela L. Nogueira, *Assistant Attorney General*
28 Liberty Street
Office of the New York Attorney General
New York, New York 10005
Phone: (212) 416-6312
steven.wu@ag.ny.gov

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

STATEMENT ......................................................................................................2

    A.    New York adopts major changes, including school closures, to respond to
the COVID-19 pandemic. ......................................................................2

    B.    In response to COVID-19, Defendants adopt the SEVP Waiver. ..........................4

    C.    New York schools rely on the SEVP Waiver as they work to address the
devastating impacts of COVID-19. ......................................................5

    D.    Defendants abruptly rescind the SEVP Waiver without advance notice and
impose almost immediate compliance obligations on higher-education
institutions. ..................................................................................7

ARGUMENT ......................................................................................................10

I.    THE BALANCE OF THE EQUITIES TIPS SHARPLY IN FAVOR OF A TEMPORARY
RESTRAINING ORDER, PRELIMINARY INJUNCTION, OR STAY. ..................................11

    A.    Plaintiff will be irreparably injured absent immediate relief. ..............................11

        1.    The Directive irreparably harms Plaintiff's educational institutions
by forcing them to overhaul their fall 2020 semester plans or risk
losing thousands of international students at their schools. ..................12

        2.    The Directive undermines schools' efforts to effectively respond to
the COVID-19 pandemic. ..................................................15

    B.    The public interest likewise weighs heavily in favor of a temporary
restraining order, preliminary injunction, or stay. ..........................................17

II.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS. ............................................18

    A.    The Directive is arbitrary and capricious. ..................................................18

    B.    Defendants failed to provide notice and opportunity to comment. ......................22

CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Allentown Mack Sales & Service, Inc. v. NLRB,*
    522 U.S. 359 (1998) ....................................................................................................18

*Am. Forest Resource Council v. Ashe,*
    946 F. Supp. 2d 1 (D.D.C. 2013) .................................................................................23

*American Wild Horse Pres. Campaign v. Perdue,*
    873 F.3d 914 (D.C. Cir. 2017) ....................................................................................19

*Bowen v. Am. Hospital Ass'n,*
    476 U.S. 610 (1986) ....................................................................................................22

*Clark County v. FAA,*
    522 F.3d 437 (D.C. Cir. 2008) ....................................................................................19

*Consumer Energy Council v. FERC,*
    673 F.2d 425 (D.C. Cir. 1982) ....................................................................................23

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ................................................................................................19

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
    140 S. Ct. 1891 (2020) ................................................................................19-20, 22, 24

*Dist. of Columbia v. U.S. Dep't of Agric.,*
    --- F. Supp. 3d ----, 2020 WL 1236657 (D.D.C. 2020) .............................................15

*Encino Motorcars, LLC v. Navarro,*
    136 S.Ct. 2117 (2016) .................................................................................................20

*Faiveley Transport. Malmo AB v. Wabtec Corp.,*
    559 F.3d 110 (2d Cir. 2009) .......................................................................................11

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ................................................................................................18-20

*Gonnella v. U.S. Sec. & Exch. Comm'n,*
    954 F.3d 536 (2d Cir. 2020) ...................................................................................23-24

*Grand River Enterprises Six Nations, Ltd. v. Pryor,*
    425 F.3d 158 (2d Cir. 2005) .......................................................................................17

*Lincoln v. Vigil,*
    508 U.S. 182, 197 (1993) ............................................................................................22

**Cases**                                                                 **Page(s)**

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015) .................................................................................. 19, 21

*Mingo Logan Coal Co. v. EPA*,
   829 F.3d 710 (D.C. Cir. 2016) ..................................................................... 18-19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*,
   463 U.S. 29 (1983) .............................................................................................. 18

*MyWebGrocer, LLC v. Hometown Info, Inc.*,
   375 F.3d 190 (2d Cir. 2004) ............................................................................... 10

*National Ass'n of Regulatory Utility Comm'rs v. Interstate Commerce Comm'n*,
   41 F.3d 721 (D.C. Cir. 1994) ............................................................................. 21

*New York v. Scalia*,
   No. 1:20-CV-01689-GHW, 2020 WL 2857207 (S.D.N.Y. June 1, 2020) ........................... 15

*New York v. U.S. Dep't of Homeland Security*,
   408 F. Supp. 3d 334 (S.D.N.Y. 2019) .................................................... 10, 15-16

*Noel v. Chapman*,
   508 F.2d 1023 (2d Cir. 1975) ............................................................................. 24

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) .............................................................................................. 22

*Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*,
   337 F. Supp. 3d 308 (S.D.N.Y. 2018) ............................................................... 17

*Shalala v. Guernsey Mem'l Hosp.*,
   514 U.S. 87 (1995) .............................................................................................. 22

*Sweet v. Sheahan*,
   235 F.3d 80 (2d Cir. 2000) ............................................................................ 22-23

*Syncor Int'l Corp. v. Shalala*,
   127 F.3d 90 (D.C. Cir. 1997) ............................................................................. 23

*United States v. Yuzary*,
   55 F.3d 47 (2d Cir. 1995) .............................................................................. 22, 24

*White v. Shalala*,
   7 F.3d 296 (2d Cir. 1993) ................................................................................... 22

**Cases**                                                                                      **Page(s)**

WPIX, Inc. v. ivi, Inc.,
   691 F.3d 275 (2d Cir. 2012) ..........................................................................................11

**Laws**

*Federal*

5 U.S.C. § 553(b) .......................................................................................................22, 24

8 C.F.R.
   § 214.2(f)(6)(i)(G) .................................................................................................4
   § 214.2(m)(9)(v) ...................................................................................................4

Proclamation 9994 of Mar. 13, 2020, Declaring a National Emergency Concerning the
   Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15,337 (Mar. 18,
   2020).........................................................................................................................3

*State*

New York Exec. Order No. 202, 9 N.Y.C.R.R. § 8.202 (2020) ...................................................2

New York Exec. Order No. 202.4, 9 N.Y.C.R.R. § 8.202.4 (2020) ............................................3

**Miscellaneous Authorities**

*Amid Ongoing COVID-19 Pandemic, Governor Cuomo Announces Schools and College
   Facilities Statewide Will Remain Closed for the Rest of the Academic Year*, N.Y.
   State (May 1, 2020), *at* https://www.governor.ny.gov/news/amid-ongoing-covid-19-
   pandemic-governor-cuomo-announces-schools-and-college-facilities .................................5

Anna Sanders, et al., *NYS coronavirus total hits 44, with majority still linked to
   hospitalized Westchester County lawyer at the hub of the ongoing health scare*, N.Y.
   Daily News (Mar. 6, 2020), *at* https://www.nydailynews.com/new-york/nyc-
   crime/ny-westchester-rabbi-with-diagnosed-with-coronavirus-20200306-
   lokwhdkgwffglfitxo3cca75wy-story.html ...........................................................................2

*Coronavirus Case Total Climbs in New York*, N.Y. Times (Mar. 12, 2020), *at*
   https://www.nytimes.com/2020/03/11/nyregion/coronavirus-new-york-update.html..............3

Ctrs. for Disease Control and Prevention, *Considerations for Schools* (May 19, 2020), *at*
   https://www.cdc.gov/coronavirus/2019-ncov/community/schools-
   childcare/schools.html............................................................................................5

Ctrs. for Disease Control and Prevention, *Interim Guidance for Administrators of US
   Institutions of Higher Education: Plan, Prepare, and Respond to Coronavirus
   Disease 2019 (COVID-19)* (Mar. 18, 2020), *at*
   https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-ihe-response.html...........3

**Miscellaneous Authorities**                                                                 **Page(s)**

*De Blasio Stays Firm on Keeping N.Y.C. Schools Open as Outbreak Spreads*, N.Y. Times
(Mar. 13, 2020), *at* https://www.nytimes.com/2020/03/13/nyregion/coronavirus-new-
york-update.html ...................................................................................................................4

John Bowden, *Cuccinelli Says Rule Forcing International Students to Return Home Will
'Encourage Schools To Reopen,'* The Hill (July 7, 2020), *at*
https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-
international-students-to-return-home. ...................................................................................9

Marjorie Valbrun, *Lives and Livelihoods*, Inside Higher Ed. (June 23, 2020), *at*
https://www.insidehighered.com/news/2020/06/23/cuny-system-suffers-more-
coronavirus-deaths-any-other-higher-ed-system-us ...............................................................5

U.S. Dep't of Homeland Sec., *Student Forms: Forms Before Entering the United States,
Dep't of Homeland Security*, *at*
https://studyinthestates.dhs.gov/students/prepare/student-forms ............................................7

U.S. Immigration & Customs Enforcement, *Broadcast Message: Coronavirus Disease
2019 (COVID-19) and Potential Procedural Adaptations for F and M nonimmigrant
students* (Mar. 9, 2020), *at* https://www.ice.gov/doclib/sevis/pdf/bcm2003-01.pdf ....... passim

U.S. Immigration & Customs Enforcement, *Broadcast Message: COVID-19 and Fall
2020* (July 6, 2020), *at* https://www.ice.gov/doclib/sevis/pdf/bcm2007-01.pdf...................7-9

U.S. Immigration & Customs Enforcement, *COVID-19: Guidance for SEVP Stakeholders*
(Mar. 13, 2020), *at*
https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20G
uidance_3.13.20.pdf...............................................................................................................4

World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on
COVID-19* (Mar. 11, 2020), *at* https://www.who.int/dg/speeches/detail/who-director-
general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 .................3

World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on
COVID-19* (Mar. 9, 2020), *at* https://www.who.int/dg/speeches/detail/who-director-
general-s-opening-remarks-at-the-mission-briefing-on-covid-19---13-march-2020...............4

## INTRODUCTION

In March 2020, as the global COVID-19 crisis was beginning to escalate, defendant U.S. Immigration and Customs Enforcement ("ICE") announced that it would allow noncitizens on student visas to maintain their visas if they took only online classes, and that this policy would remain "in effect for the duration of the [COVID-19] emergency." Relying on ICE's announcement, institutions of higher education across the country—including the eighty-nine campuses of the State University of New York ("SUNY") and City University of New York ("CUNY")—implemented complex plans for the fall 2020 semester providing for online instruction to ensure the continued education of their students, including international students, while protecting students, faculty, and the public from the further spread of COVID-19.

Since March, the COVID-19 crisis has only deepened in this country. Yet just one week ago, on July 6, 2020—without any advance notification or apparent consultation—ICE abruptly rescinded its March policy, dictating that noncitizens on student visas must attend "in-person instruction" or else "face immigration consequences including, but not limited to, initiation of removal proceedings." ICE then ordered schools to decide within just nine days—by July 15—whether they would maintain or modify their fall 2020 semester plans for online instruction.

ICE's sudden reversal of position and unreasonable timeline for compliance violate the most basic requirements for agency decision-making under the Administrative Procedure Act ("APA"). ICE articulated no discernible rationale for this abrupt change, nor for the extraordinarily truncated schedule it gave schools and students to reconsider plans that had been carefully considered and put into place for months. It did not display any awareness of the serious reliance interests engendered by its announcement just a few months ago that international students could maintain their student visas with online instruction "for the duration

1

of the [COVID-19] emergency." It did not acknowledge the enormous harms that this rescission will have on both students and institutions of higher education across the country. And it did not give anybody advance notice of this change, let alone an opportunity to comment on its deeply misguided nature.

The APA's requirement of reasoned decision-making forbids an agency from imposing such sweeping harms with so little justification. And Plaintiff State of New York has a pressing need for immediate relief from this Court: unless this Court acts soon to halt ICE from carrying out its arbitrary and capricious policy change, Plaintiff and its educational institutions will be almost immediately subject to costly and burdensome compliance obligations, and international students in New York will face the immediate threat of removal or other immigration consequences. This Court should accordingly enter a temporary restraining order, preliminary injunction, or stay under 5 U.S.C. § 705 to prevent ICE from implementing its policy change.

## STATEMENT

**A.     New York adopts major changes, including school closures, to respond to the COVID-19 pandemic.**

Since early March, the State of New York has undertaken major efforts to combat and control the spread of COVID-19. Following a sudden Westchester County outbreak traced to a single individual,[1] the Governor of New York declared a state of emergency on March 7, 2020. New York Exec. Order No. 202, 9 N.Y.C.R.R. § 8.202 (2020). Within days, on March 11, 2020,

---

[1] Anna Sanders, et al., *NYS coronavirus total hits 44, with majority still linked to hospitalized Westchester County lawyer at the hub of the ongoing health scare*, N.Y. Daily News (Mar. 6, 2020), *at* https://www.nydailynews.com/new-york/nyc-crime/ny-westchester-rabbi-with-diagnosed-with-coronavirus-20200306-lokwhdkgwffglfitxo3cca75wy-story.html. (All websites last visited July 13, 2020).

the World Health Organization declared COVID-19 a global pandemic—the world's first pandemic caused by a coronavirus, a type of respiratory disease most easily transmitted through close face-to-face contact.[2] Two days later, the President declared a national emergency to contain and combat the virus in the United States.[3] Both the state and federal declarations of emergency remain in force.

By March 18, 2020, the federal Centers for Disease Control and Prevention ("CDC") had issued interim guidance directing colleges and universities to close in-person instruction at least temporarily if there was even one confirmed case of COVID-19 on campus.[4] The Governor of New York issued an executive order the same day closing all schools in New York to in-person classes. New York Exec. Order No. 202.4, 9 N.Y.C.R.R. § 8.202.4 (2020). SUNY and CUNY had already shuttered by then and moved instruction fully online for the remainder of the spring semester.[5] Laursen Decl. ¶ 45; Kamona Decl. ¶ 26.[6]

---

[2] *See* World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19* (Mar. 11, 2020), *at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[3] Proclamation 9994 of Mar. 13, 2020, *Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, 85 Fed. Reg. 15,337 (Mar. 18, 2020).

[4] Ctrs. for Disease Control and Prevention, *Interim Guidance for Administrators of US Institutions of Higher Education: Plan, Prepare, and Respond to Coronavirus Disease 2019 (COVID-19)* (Mar. 18, 2020), *at* https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-ihe-response.html.

[5] *Coronavirus Case Total Climbs in New York*, N.Y. Times (Mar. 12, 2020), *at* https://www.nytimes.com/2020/03/11/nyregion/coronavirus-new-york-update.html.

[6] Declarations cited in this memorandum are attached as exhibits to the Declaration of Steven C. Wu, ECF No. 5.

**B.      In response to COVID-19, Defendants adopt the SEVP Waiver.**

On March 9, 2020, the Student and Exchange Visitor Program ("SEVP") division of ICE issued a Broadcast Message announcing that the agency "intend[ed] to be flexible with temporary adaptations" triggered by the pandemic.[7]  On March 13, 2020, ICE issued a waiver ("SEVP Waiver") that lifted the application of certain agency regulations that otherwise would have required noncitizens on F-1 and M-1 student visas to attend a majority of their classes in person, rather than online.[8]  *See* 8 C.F.R. § 214.2(f)(6)(i)(G), (m)(9)(v).  This March policy explained that, given "the extraordinary nature of the COVID-19 emergency," the waiver would remain in "effect for the duration of the emergency."[9]  At the time, there were only 132,000 recorded coronavirus cases in the world[10] and only 421 in the State of New York.[11]

---

[7] U.S. Immigration & Customs Enforcement, *Broadcast Message: Coronavirus Disease 2019 (COVID-19) and Potential Procedural Adaptations for F and M nonimmigrant students*, (Mar. 9, 2020), *at* https://www.ice.gov/doclib/sevis/pdf/bcm2003-01.pdf.

[8] U.S. Immigration & Customs Enforcement, *COVID-19: Guidance for SEVP Stakeholders* (Mar. 13, 2020) ("March 2020 Broadcast Message"), *at* https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_3.13.20.pdf.

[9] *Id.*

[10] *See* World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19* (Mar. 9, 2020), *at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-mission-briefing-on-covid-19---13-march-2020.

[11] *De Blasio Stays Firm on Keeping N.Y.C. Schools Open as Outbreak Spreads*, N.Y. Times (Mar. 13, 2020), *at* https://www.nytimes.com/2020/03/13/nyregion/coronavirus-new-york-update.html.

**C.      New York schools rely on the SEVP Waiver as they work to address the devastating impacts of COVID-19.**

Within weeks, New York had become the epicenter of the COVID-19 pandemic in the United States. When the Governor announced on May 1, 2020, that all of New York's K-12 schools and college campuses would remain closed to in-person instruction for the rest of the semester, there were 308,314 confirmed cases in the State.[12] Over 18,000 New Yorkers had lost their lives to the pandemic in just two short months, including dozens of staff and faculty at CUNY and SUNY.[13]

That same month, on May 19, the CDC issued further guidance to schools as they considered plans for reopening.[14] The CDC advised that "students and teachers engage[d] in virtual-only classes, activities, and events" carried the lowest risk of infection.[15] For schools that nevertheless decided to proceed with in-person instruction, the CDC advised to "increase circulation of outdoor air as much as possible," "space seating/desks at least 6 feet apart when feasible," "install physical barriers, such as sneeze guards and partitions, particularly in areas where it is difficult for individuals to remain at least 6 feet apart," "[c]lose communal use shared

---

[12] *Amid Ongoing COVID-19 Pandemic, Governor Cuomo Announces Schools and College Facilities Statewide Will Remain Closed for the Rest of the Academic Year*, N.Y. State (May 1, 2020), *at* https://www.governor.ny.gov/news/amid-ongoing-covid-19-pandemic-governor-cuomo-announces-schools-and-college-facilities.

[13] Marjorie Valbrun, *Lives and Livelihoods*, Inside Higher Ed. (June 23, 2020), *at* https://www.insidehighered.com/news/2020/06/23/cuny-system-suffers-more-coronavirus-deaths-any-other-higher-ed-system-us.

[14] Ctrs. for Disease Control and Prevention, *Considerations for Schools* (May 19, 2020), *at* https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/schools.html.

[15] *Id.*

spaces such as dining halls," "train staff on all safety protocols," and "conduct daily health checks."[16]

Following federal and state guidance, schools in New York expended significant time and effort working with New York state officials to craft reopening plans for the fall 2020 semester that ensure students, staff, and faculty will not be subjected to undue risk of infection.

For SUNY, developing a plan tailored to the unique needs of each of the university system's components while complying with state guidelines has required herculean efforts and enormous staff resources over the past several months. SUNY is the nation's largest comprehensive system of higher education, with 64 campuses and over 1.3 million students; it is connected to the largest comprehensive university-affiliated research foundation in the country, which operates a more than $1 billion research program; and it is the State's largest single employer. Laursen Decl. ¶¶ 5–9.

At the outset, SUNY administrators formed a system-level task force to oversee the "response" and "reopening" phases of the crisis. *Id*. ¶ 4. For response, the transition to remote learning proved to be an enormous undertaking. SUNY had to rapidly deploy and divert resources, posing extraordinary challenges to faculty, staff, and students—particularly with respect to students with disabilities and low-income students with limited access to technology.

For reopening, SUNY sought to shift from crisis management to careful, considered strategic planning for the long term. To that end, each of SUNY's 64 campuses drafted reopening plans that were tailored to comply with state guidelines on social distancing, sanitation, and health monitoring while still allowing campuses to offer online, in-person, or hybrid courses. Careful analysis of the space constraints and physical infrastructure at each of

---

[16] *Id*.

SUNY's diverse campuses informed the extent to which in-person courses could be offered.

The same considerations were carefully weighed at CUNY, the nation's largest urban university, which has 25 campuses; 400,000 students in full, part-time, adult, and continuing-education programs; 45,000 full- and part-time employees; and a $512 million research affiliate. Kamona Decl. ¶¶ 3, 5.

Throughout their months'-long planning processes, SUNY and CUNY relied on ICE's assurance that the SEVP Waiver would remain in "effect for the duration of the emergency"[17] while the schools followed federal and state guidelines to prioritize online instruction to avoid the in-person contacts that are the vector for COVID-19's spread. Laursen Decl. ¶¶ 36; Kamona Decl. ¶ 25. The schools thus expected that its international students on F-1 and M-1 visas would remain enrolled and present in the country for the fall 2020 semester and, accordingly, issued Form I-20s to those students.[18] Following issuance of those Form I-20s, SUNY and CUNY expected that these students would be able to remain in the United States and contribute to revenue, research, and academics on their campuses, while attending classes remotely.

**D.    Defendants abruptly rescind the SEVP Waiver without advance notice and impose almost immediate compliance obligations on higher-education institutions.**

On July 6, 2020, Defendants plunged these careful plans into chaos. Without notice, ICE issued a Broadcast Message ("the Directive") announcing that it would rescind the SEVP Waiver

---

[17] *March 2020 Broadcast Message*, *supra*, note 8.

[18] International students accepted to an SEVP-certified institution need the institution to issue them a Form I-20 in order to "apply for a student visa, to enter the United States and apply for benefits." U.S. Dep't of Homeland Sec., *Student Forms: Forms Before Entering the United States*, *at* https://studyinthestates.dhs.gov/students/prepare/student-forms.

and thereby reverse the policy that higher-education institutions around the country had already factored into their plans for the fall 2020 semester, which is now only weeks away.[19]

The Directive now provides that online-only instruction is not sufficient for international students on F-1 and M-1 visas to maintain their visa status. Instead, such international students must either enroll in in-person classes for the fall 2020 semester or immediately depart the country. If they fail to do so, they could be subject to "immigration consequences including, but not limited to, the initiation of removal proceedings." Directive at 1. And students on F-1 and M-1 visas currently outside of the United States will be barred from reentering the country if their schools will be fully remote in the fall. *Id*. at 2.

On top of the sudden reversal of the SEVP Waiver, ICE's new Directive also requires schools offering online-only instruction to submit an "operational change plan" no later than this upcoming Wednesday, July 15, 2020—just nine days after the surprise announcement of the Directive. *Id*. Schools offering in-person or hybrid instruction must submit plans for review by August 1, 2020. *Id*. at 2-3. In other words, the Directive gives schools that planned to offer only online instruction between *seven and nineteen business days* to reconsider and adjust plans that they have been developing over several months of coordinated efforts from thousands of administrators, faculty, and staff. And for many schools, the Directive comes at the eleventh hour—just weeks before the fall 2020 semester is set to begin. The Directive offers no rationale for these arbitrarily compressed deadlines.

For universities that will offer a mix of online and in-person courses, officials must issue new Form I-20s to international students enrolled for the fall by August 4, 2020. The new forms

---

[19] U.S. Immigration & Customs Enforcement, *Broadcast Message: COVID-19 and Fall 2020* (July 6, 2020) (cited in text as "Directive"), *at* https://www.ice.gov/doclib/sevis/pdf/bcm2007-01.pdf.

must certify that the student's "program is not entirely online, that the student is not taking an entirely online course load for the fall 2020 semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program." *Id.* at 1-2. As such, the Directive essentially asks schools to take costly and time-intensive measures to create new processes and procedures that will get international students registered and certified *within twenty-one business days.* And, yet again, the Directive offers no explanation for mandating this extraordinary expenditure of school resources in the span of weeks.

Although the SEVP Waiver in March 2020 had been expressly based on "the extraordinary nature of the COVID-19 emergency,"[20] the Directive makes no mention of the current state of that emergency. The Directive is the silent about the fact that, as of the date of this filing, the United States is seeing record-setting COVID-19 infection rates each day, far in excess of the crisis that had precipitated the March policy. As of July 13, 2020, over 3 million Americans have tested positive for coronavirus, and over 132,000 have died of COVID-19 and related illnesses. And over 400,000 New Yorkers have been infected and nearly 25,000 have died during this period—more cases and casualties than had been recorded *in the world* when ICE initially issued the SEVP Waiver in mid-March. Rather than acknowledging that the pandemic is still raging, the Directive mistakenly refers to the March issuance of the SEVP Waiver as taking place during the "height" of the COVID-19 crisis. This could not be further from the truth.

The Directive itself does not give any affirmative reasons for ICE's abrupt policy shift, aside from a conclusory reference to "a concordant need to resume the carefully balanced protections implemented by federal regulations." Directive at 1. The day after the rescission,

---

[20] *March 2020 Broadcast Message*, *supra*, note 8.

however, Acting Deputy Secretary of Homeland Security Ken Cuccinelli stated that the purpose of the agency's change in policy was to "encourage schools to reopen."[21]

## ARGUMENT

This Court may grant a temporary restraining order, preliminary injunction, or stay under 5 U.S.C. § 705 if the moving party demonstrates "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004) (quotation marks omitted); *see also New York v. U.S. Dep't of Homeland Security*, 408 F. Supp. 3d 334, 353 n.5 (S.D.N.Y. 2019) ("*DHS*").

Here, all of these factors support temporary relief to preserve the status quo and to prevent Defendants' imminent implementation of their suddenly announced Directive. The Directive's fundamental alteration of Defendants' treatment of noncitizens on student visas will irreparably injure Plaintiff by requiring its educational institutions to reconsider or redo plans that have already been put in place for the fall 2020 semester; by threatening serious immigration consequences for tens of thousands of international students whose lives have been upended by this abrupt policy shift; by inflicting unrecoverable financial costs, including loss of tuition and administrative costs; and by hampering Plaintiff's efforts to responsibly address the ongoing COVID-19 crisis even as that already-unprecedented crisis continues to escalate in severity

---

[21] John Bowden, *Cuccinelli Says Rule Forcing International Students to Return Home Will 'Encourage Schools To Reopen,' The Hill* (July 7, 2020), *at* https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international-students-to-return-home.

around the country.  The public interest also weighs heavily in favor of preserving the status quo and thus against immediate implementation of the Directive.  And on the other side of the ledger, Defendants have identified no discernible reason to implement this change now, particularly under the extraordinarily compressed timeframe that they have chosen to impose.

On the merits, Plaintiff is likely to succeed because the Directive violates the most basic requirements of reasoned decision-making under the APA. The Directive does not identify *any* rationale for its abrupt change in policy.  It does not explain why reversal of the March SEVP Waiver is warranted now when the COVID-19 crisis that supported that original policy remains with us today—and has only worsened in much of the country.  And it does not acknowledge *at all* the burdens imposed by the Directive or the reliance interests engendered by the March policy.  The Directive's sudden imposition of enormous costs with no explanation is a textbook violation of the APA's prohibition on arbitrary agency action.  A temporary restraining order, preliminary injunction, or stay under 5 U.S.C. § 705 is therefore appropriate to preserve the status quo—allowing international students who engage in online-only coursework in the United States to maintain their student visas for "the duration of the [COVID-19] emergency," as Defendants promised just a few months ago.[22]

I.      **THE BALANCE OF THE EQUITIES TIPS SHARPLY IN FAVOR OF A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, OR STAY.**

A.      **Plaintiff will be irreparably injured absent immediate relief.**

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118

---

[22] *March 2020 Broadcast Message*, *supra*, note 8.

(2d Cir. 2009) (quotation marks omitted). "Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (alteration omitted). "Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012). Plaintiff readily meets this standard.

> **1.    The Directive irreparably harms Plaintiff's educational institutions by forcing them to overhaul their fall 2020 semester plans or risk losing thousands of international students at their schools.**

ICE's carefully considered SEVP Waiver from March 2020 allowed international students to engage in remote instruction and online learning while maintaining their F-1 or M-1 status. Educational institutions including SUNY and CUNY have relied on that March policy to plan their fall 2020 semesters—a task that has proven to be especially complex and difficult given the ever-shifting nature of the COVID-19 crisis. Laursen Decl. ¶ 36; Kamona Decl. ¶ 25. The Directive's abrupt reversal of this policy—without any advance notice to or consultation with educational institutions, and after many institutions have already invested significant time and resources in finalizing their fall 2020 semester plans—will impose immediate and irreparable harms to Plaintiff.

For one thing, the Directive's threat to international students' immigration status puts enormous pressure on Plaintiff's institutions to make changes to their fall 2020 semester plans— namely, by increasing the number of in-person course offerings to ensure that their international students will be able to secure sufficient placements in such courses. And Plaintiff's educational institutions must adapt their fall 2020 course offerings in a matter of days, as schools have only until Wednesday, July 15—nine days after ICE's surprise announcement of the Directive—to

notify ICE regarding the status of their remote-learning programs. Moreover, given the abrupt and sweeping changes required by the Directive, CUNY and SUNY expect to devote significant resources to counseling international students about in-person or hybrid course offerings that will enable students to continue to make normal progress in their degree program. Laursen Decl. ¶ 36; Kamona Decl. ¶ 28.

The Directive also requires schools to expend additional resources—at significant cost— to comply with the new recertification requirements of the Directive by August 4, 2020. Laursen Decl. ¶ 41. SUNY anticipates that it will have to devote over 9,000 hours of additional staff time completing recertifications of international students pursuant to the Directive—corresponding to $410,000 in salary expenses alone. *Id*.

Unfortunately, given the last-minute nature of the Directive's issuance, it may be practically impossible for all of Plaintiff's campuses or students to comply with the Directive's central demand—namely, that schools provide (and students take) more in-person courses. State guidelines demand that educational institutions provide at least six feet of space between students (Laursen Decl. ¶ 18), but many facilities do not have additional, empty classrooms to meet this requirement. Many students have also already enrolled in fall semester programs, and will have significant difficulty changing their course load to enroll in additional in-person offerings under the timeframe imposed by the Directive. And local health care infrastructure in many of the areas where SUNY campuses are located are already over-stressed and thus ill-equipped to cope with the increase in COVID-19 cases that is likely to follow from the greater in-person contacts contemplated by this Directive. The limitations of SUNY's educational, residential, and health care infrastructure, as well the limitations of its partner communities,

makes it impractical and imprudent for SUNY to increase in-person course options across the board without demonstrable academic or curricular need. Laursen Decl. ¶ 18.

If Plaintiff's educational institutions forgo these changes, however, then the immigration statuses of the approximately 100,000 international students enrolled at colleges and universities across New York State will be jeopardized under the Directive. That harm not only inflicts incalculable personal losses on the international students who are important members of our communities (educational and otherwise)—it will also cause colleges, universities, and New York State as a whole to lose millions of dollars in lost tuition and spending, and to be deprived of the invaluable contributions that these students provide.

For example, SUNY employs more than 3,800 international students as research assistants, teaching assistants, and in other capacities. Laursen Decl. ¶ 23. As a result of the Directive, a significant number of international students may withdraw from SUNY and leave their job posts, thus leaving many projects, including research on COVID-19 and other life-saving endeavors, in limbo. Laursen Decl. ¶ 24.

CUNY and SUNY expect to suffer millions of dollars in lost tuition from international students who may disenroll or transfer, or who will be unable to safely continue remote learning in their home countries due to the Directive's requirements. Laursen Decl. ¶ 22; Kamona Decl. ¶ 15. SUNY similarly expects to lose revenue from students not living in or near campus, and therefore not spending money on housing, dining, and student health centers. Laursen Decl. ¶ 34. And it will be difficult for these institutions to recruit new international students in following admissions cycles if there is uncertainty about their ability to complete their programs due to arbitrary and capricious immigration policy changes. Laursen Decl. ¶ 27: Kamona ¶ 19. New York has been proud to be the first choice of tens of thousands of the best students from

14

around the world every year to pursue higher education. But the high quality of the students whom New York has been able to attract makes it altogether too easy for them to find other international options—such as institutions in Canada, Europe, and Australia—if they cannot be assured of their ability to complete their studies here. New York and its educational institutions may never recover from the loss of human and financial capital from these students.

The real-time burdens imposed by the Directive are being felt acutely by institutions across New York. Schools' expenditures of time and resources—and concomitant diversion from other priorities—cannot be recovered. *See New York v. Scalia*, No. 1:20-CV-01689-GHW, 2020 WL 2857207, at *11 (S.D.N.Y. June 1, 2020); *DHS*, 408 F. Supp. 3d at 350. Such injury is irreparable where, as here, Plaintiff will not be unable to recover damages to compensate for the impacts of illegal agency action. *See Dist. of Columbia v. U.S. Dep't of Agric.*, --- F. Supp. 3d ---, 2020 WL 1236657, at *23 (D.D.C. 2020). Courts have recognized that the types of administrative burdens faced by Plaintiff here— such as amending policies and procedures and navigating legal conflicts created by a regulation—are sufficient to warrant preliminary injunctive relief. *See, e.g.*, *id.* at *22–26.

### 2. The Directive undermines schools' efforts to effectively respond to the COVID-19 pandemic.

The Directive would require Plaintiff's institutions to increase their share of in-person class offerings at the same time that public health experts recommend *minimizing* in-person activities—particularly while indoors. The Directive is therefore directly undermining Plaintiff's efforts to respond to the ongoing COVID-19 global pandemic, thereby endangering public health. *DHS*, 408 F. Supp. 3d at 351.

Based upon the judgment of public health experts, and in reliance on the March 2020

SEVP Waiver, schools and campuses across the state and around the country have closed to in-person instruction and maximized online instruction in order to minimize personal contacts and thus reduce the transmission of the coronavirus.

For most brick-and-mortar educational institutions, the transition to online learning for all students required schools to quickly identify, acquire, and deploy a number of resources—from computers to staff and students to facilitate remote learning, to personal protective equipment and cleaning, to equitable access for students with disabilities.   Laursen Decl. ¶ 45; Kamona Decl. ¶ 34.   At the same time, schools and colleges have worked for months on developing hybrid remote and in-person reopening plans for the fall 2020 semester.  Laursen Decl. ¶¶ 35-37; Kamona Decl. ¶ 24.  These reopening plans are designed to comply with state and federal directives for operation in light of current public health considerations related to the COVID-19 crisis, while maintaining educational access. Laursen Decl. ¶ 35; Kamona Decl. ¶ 24.

The Directive's sudden imposition of stark immigration consequences for international students forces schools to revisit these carefully considered plans and consider moving back to a more in-person model—or else suffer the loss of (or harm to) their international students. Furthermore, the Directive fails to appreciate the ever-changing reality of the COVID-19 epidemic, where transmission rates fluctuate on a daily basis.  If any region in New York State were to experience an uptick in coronavirus numbers and need to fully close schools again as a result, international students and schools within the region would be unable to comply with the Directive's pressure to reinstate in-person courses without violating state law and severely undermining public health. *See DHS*, 408 F. Supp. 3d at 350-51.

**B.   The public interest likewise weighs heavily in favor of a temporary restraining order, preliminary injunction, or stay.**

Consideration of the equities and the public interest "merge when an injunction is to be issued against the government." *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018), *appeal withdrawn*, 2019 WL 5618617 (2d Cir. June 14, 2019).   For many of the reasons already discussed, the public interest strongly counsels in favor of preserving the status quo and preventing Defendants from immediately implementing their abrupt policy reversal.

The public interest in preventing the spread of COVID-19 can hardly be overstated.   The preservation of "public health" is a "significant public interest." *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005).   And the COVID-19 pandemic has been an unprecedented public-health crisis that has inflicted enormous harms on this country. There can be no serious dispute that the fall 2020 semester reopening plans of higher-education institutions such as SUNY and CUNY, including their focus on online instruction, will meaningfully address the COVID-19 crisis by minimizing the in-person contacts that are the vector of the disease's spread.   Indeed, Defendants' own March 2020 SEVP Waiver recognized the wisdom of this approach in endorsing international students' reliance on such online learning instead of in-person instruction.

On the other side of the ledger, Defendants have identified no countervailing considerations weighing in favor of immediate implementation of the Directive.   The Directive is utterly silent about such benefits.   See *infra* Point II.A.   And no benefit is immediately apparent. The Directive does not promote public health.   It does not serve the educational interests of students (international or otherwise) or the interests of institutions of higher learning.   And noncitizens on student visas are lawfully present and make significant contributions to their

schools and the broader community—through the valuable work that they do as fellow teachers and researchers, through their participation in the student communities at our schools, and through their tuition payments and participation in our local economies. The equities weigh sharply against the precipitous loss of these contributions for no discernible benefit whatsoever.

## II. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.

Plaintiff is also likely to succeed on the merits of its APA claims. Under the APA, the agency's abrupt rescission of its prior policy required a reasoned explanation that accounted for all important factors. Instead, the agency gave no explanation for its about-face and disregarded the serious harms to schools, students, and staff without the opportunity for public comment.

## A. The Directive is arbitrary and capricious.

The APA "establishes a scheme of 'reasoned decisionmaking.'" *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 52 (1983). Under that scheme, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation marks omitted). An agency's explanation is deficient if it "entirely fail[s] to consider an important aspect of the problem" or "runs counter to the evidence before the agency." *Id.* Here, ICE utterly disregarded these requirements in issuing its Directive.

First, when, as here, an agency changes a prior policy, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009). But here, the Directive reverses ICE's prior policy without even acknowledging—much less giving a reason for

disregarding—that the "facts and circumstances" that prompted its original policy remain the same. *Id.*; *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (an agency must "articulate[] a satisfactory explanation for [its] decision").

ICE's original March 2020 policy was appropriately based on "the extraordinary nature of the COVID-19 emergency,"[23] which unanimous medical opinion recognized could only be halted by limiting in-person contacts. But this crisis had only worsened by the time ICE announced its rescission just one week ago, on July 6. See *supra* at 9. Startlingly, the Directive contains not one mention of the undisputed fact that the public-health crisis that prompted the March SEVP Waiver has not just persisted but further deteriorated. The APA does not permit agencies to abandon prior policies "without any consideration whatsoever" of the harms that the original policy addressed. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1912 (2020). And it is particularly egregious for an agency to reverse course when the rationale for its original policy has only been reinforced by more recent events, as is the case here. Because "the only evidence in the record available . . . actually supports the *opposite*" of what ICE has done, its Directive fails to "satisfy the APA's reasoned decisionmaking requirement." *Clark County v. FAA*, 522 F.3d 437, 442 (D.C. Cir. 2008) (Kavanaugh, J.).

Second, Defendants entirely failed to acknowledge, let alone reasonably consider, the Directive's impact on schools and students, including its disruption of reasonable reliance interests engendered by ICE's SEVP Waiver from March. Consideration of costs is an inescapable requirement of agency decision-making. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015); *see also American Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 931 (D.C. Cir. 2017) (vacating agency action due to failure to consider "broader, real-world impact"); *Mingo*

---

[23] *March 2020 Broadcast Message*, *supra*, note 8.

*Logan Coal Co. v. EPA*, 829 F.3d 710, 732–733 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) ("consideration of costs is an essential component of reasoned decisionmaking under the Administrative Procedure Act"). Yet here, the Directive is completely silent about the burdens that its abrupt policy shift will impose on both students and educational institutions. See *supra* at 11-16.

The Directive is also silent about the serious administrative burdens imposed by its requirements that, in just days or weeks, schools must (a) update their plans for instruction for the fall 2020 semester, and (b) potentially issue recertifications for thousands of students on student visas. That compressed schedule takes no account whatsoever of the magnitude and complexity of the task facing schools and the difficulty of making any changes so close to the beginning of the fall semester. SUNY alone, for example, has sixty-four campuses, serves more than 400,000 enrolled students, and counts almost 15,000 enrolled international students as part of its community. Laursen Decl. ¶¶ 5-6, 14. And SUNY has been making plans for the upcoming fall semester in light of the unprecedented COVID-19 crisis for months. *Id.* ¶ 4. But the Directive imposes imminent compliance deadlines on schools like SUNY without paying even lip service to the burdens this timeline will cause.

Beyond the aforementioned harms, the Directive also failed to consider whether there was "legitimate reliance" on the prior policy. *Regents*, 140 S. Ct. at 1913. "When an agency changes course," it must take account the fact that its prior policy "'may have engendered serious reliance interests.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)). "It would be arbitrary or capricious to ignore such matters." *Fox Television*, 129 S. Ct. at 515. But here, the Directive does not even acknowledge such reliance interests, despite the fact that institutions of higher education such as SUNY have based their plans for the fall

semester on ICE's March SEVP Waiver.  That failure is particularly egregious because ICE's March policy had specifically represented that its treatment of online learning for holders of student visas would remain "in effect for the duration of the [COVID-19] emergency."  And that emergency has not yet ended at either the state or federal level—indeed, it has only gotten worse in many parts of the country.  The Directive's total failure to even acknowledge the reliance interests that ICE specifically elicited is arbitrary and capricious.

Third, the Directive fails to articulate any discernible rationale in support of its extraordinary and abrupt change of policy.   It is a "foundational principle of administrative law" that, in reviewing agency action, courts look to "the grounds that the agency invoked when it took the action." *Michigan*, 576 U.S. at 758.  But here, the rationale for ICE's policy is a mystery.  The only apparent justification offered in the Directive is a single, glancing reference to "a concordant need to resume the carefully balanced protections implemented by federal regulations."  Directive at 1. But this conclusory statement is content-free.  ICE does not specify the "need" or identify the "protections" the Directive serves.  And its reference to "balanc[ing]" is wholly inadequate when ICE "made no findings specifically directed to the choice between" competing options—indeed, it did not even identify the options under consideration. *Burlington*, 371 U.S. at 168.  ICE's decision was thus "not so much a balance of conflicting policy goals as the acceptance of one without any real consideration" of any others. *National Ass'n of Regulatory Utility Comm'rs v. Interstate Commerce Comm'n*, 41 F.3d 721, 728 (D.C. Cir. 1994).

ICE's decision to abruptly impose serious harms without any discernible justification is a stark breach of the most fundamental prerequisite for agency action.  As the Supreme Court recently recognized, the requirement that agencies articulate a reasoned basis for their actions "ensur[es] that parties and the public can respond fully and in a timely manner to an agency's

21

exercise of authority." *Regents*, 140 S. Ct. at 1909. But when, as here, an agency chooses to act without any justification at all, it is impossible to ensure "agency accountability," *Bowen v. Am. Hospital Ass'n*, 476 U.S. 610, 643 (1986). ICE's utter failure "to explain the rationale and factual basis for its decision," *id*. at 627, thus renders the Directive unlawful.

**B.      Defendants failed to provide notice and opportunity to comment.**

Finally, Plaintiff is also likely to succeed on the claim that the Directive violates the APA's notice-and-comment requirements. The APA requires agencies to follow notice-and-comment procedures when issuing "substantive" or "legislative" rules. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95–96 (2015); *see also* 5 U.S.C. § 553(b). Legislative rules are agency rules that have the "force and effect of law"—that is, they regulate the rights, obligations, or powers of relevant parties. *Perez*, 575 U.S. at 96; *see also White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993).

By contrast, "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" are exempt from the APA's notice-and-comment requirements. 5 U.S.C. § 553(b)(A). "But that convenience comes at a price[.]'" *Perez*, 575 U.S. at 97 (citing *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). Interpretive rules "do not create rights, but merely clarify an existing statute or regulation." *United States v. Yuzary*, 55 F.3d 47, 51 (2d Cir. 1995) (quotation marks omitted). Their "critical feature" is that they "advise the public of the agency's construction of the statutes and rules." *White*, 7 F.3d at 303 (quotation marks omitted). Similarly, policy statements only "advise the public prospectively on the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil,* 508 U.S. 182, 197 (1993) (quotation marks omitted).

In the Second Circuit, courts "look to" several factors identified in *Sweet v. Sheahan*, 235 F.3d 80 (2d Cir. 2000), to determine whether a rule is legislative and thus requires notice and

comment.  Here, the first *Sheahan* factor is dispositive: namely, "whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties."  *Gonnella v. U.S. Sec. & Exch. Comm'n*, 954 F.3d 536, 547 (2d Cir. 2020) (quoting *Sheahan*, 235 F.3d at 91).  This first factor "is another way of asking whether the disputed rule really adds content to the governing legal norms."  *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 96 (D.C. Cir. 1997).

Here, the Directive satisfies this factor.  At the time of the Directive's adoption, the "governing legal norm" was the SEVP Waiver permitting F-1 and M-1 visa students to remain in the United States while taking online courses.  Relying on that waiver, New York schools developed strategic plans for the fall 2020 semester and issued the standard Form I-20s to students.  The Directive not only rescinds the SEVP Waiver, but also imposes new obligations and prohibitions on schools, on an unusually expedited schedule.  As discussed above, all schools must now submit an "operational change plan" by July 15; further updates to their operational plans by August 1; and reissuances of Form I-20s, in compliance with new certification requirements, by August 4.  None of these obligations would exist without the Directive.  But although the Directive thus "adds content" to established norms, *Syncor Int'l*, 127 F.3d at 96, ICE failed to provide notice or an opportunity to comment.  For this reason alone, this Court should vacate the Directive.[24]

---

[24] It is immaterial that the SEVP Waiver in March 2020 was issued without notice and comment.  Courts have recognized that the procedures followed in promulgating an original rule do not automatically exempt an agency from providing notice and comment in modifying or repealing that rule.  *See, e.g.*, *Consumer Energy Council v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982); *Am. Forest Resource Council v. Ashe*, 946 F. Supp. 2d 1, 26 (D.D.C. 2013).  And here, the Directive adds new obligations not imposed by either the SEVP Waiver or the status quo prior to that March policy; the rationale for those obligations, including their extraordinarily compressed schedule, is independently "worthy of notice and an opportunity to comment."  *Consumer Energy Council*, 673 F.2d at 447 n.79.

For these same reasons, the Directive does not constitute a mere policy statement or interpretive rule. As the Second Circuit has repeatedly explained, "policy statements generally impact agency behavior rather than change the 'existing rights' of others outside the agency." *Gonnella*, 954 F.3d at 546 (quoting *Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975)). Similarly, interpretive rules "merely clarify an existing statute or regulation." *Yuzary*, 55 F.3d at 51 (quotation marks omitted). The sudden reversal of the SEVP Waiver coupled with new certification and other administrative obligations does not leave the "existing rights of others outside the agency" unchanged or merely construe a statutory or regulatory provision. *Gonnella*, 954 F.3d at 546 (quotation marks omitted). Accordingly, the exception to notice-and-comment requirements for interpretative rules or policy statements does not apply.

Nor does the APA's "good cause" exception for legislative rules apply here. The "good cause" exception permits a legislative rule to forgo notice-and-comment procedures if the agency finds them "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). But the APA requires that the agency "incorporates the finding [of good cause] and a brief statement of reasons therefor in the rules issued." *Id.* As the Directive does not include the requisite finding or incorporate a statement of good cause, the exception is inapplicable. And it is too late for Defendants to show good cause now: an agency's "impermissible *post hoc* rationalizations" are "not properly before [the Court]." *Regents*, 140 S. Ct. at 1909.

This Court should accordingly vacate the Directive for failing to provide notice and an opportunity to comment as required by the APA.

## CONCLUSION

The Court should enter a temporary restraining order or preliminary injunction preventing Defendants from implementing the Directive, or a stay under 5 U.S.C. § 705 postponing the Directive's effective dates and preserving Plaintiff's rights.

DATED: July 13, 2020

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

Matthew Colangelo
  *Chief Counsel for Federal Initiatives*

Elena Goldstein
  *Deputy Chief, Civil Rights Bureau*

By: /s/ Steven C. Wu
Steven C. Wu, *Deputy Solicitor General*
Morenike Fajana, *Special Counsel*
Carolyn Fast, *Special Counsel*
Joel Marrero, *Assistant Attorney General*
*(pro hac vice forthcoming)*
Daniela Nogueira, *Assistant Attorney General*
Office of the New York Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6312
steven.wu@ag.ny.gov

*Attorneys for the State of New York*